IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Jerry R. Clemons,                :
              Plaintiff       :    Civil Action 2:10-cv-00892

      v.                     :    Judge Graham

Michael J. Astrue,             :    Magistrate Judge Abel
Commissioner of Social Security,
             Defendant    :

**REPORT AND RECOMMENDATION**

Plaintiff Jerry R. Clemons brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**<u>Summary of Issues.</u>**

Plaintiff Jerry R. Clemons asserts he became disabled at age 50 by arthritis, back pain, hepatitis C with joint arthralgia, a dysthymic disorder, and a generalized anxiety. He was 54 years old when the administrative law judge issued the decision denying benefits. The administrative law judge found that Clemons retained the ability to perform a reduced range of jobs having light exertional demands.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed reversible error in refusing to give controlling weight or at least great weight to the opinion of plaintiff's treating doctor;

- The administrative law judge improperly assessed plaintiff's credibility; and,

- The administrative law judge failed to consider Medical Vocational Guideline 201.12.

**Procedural History.**  Plaintiff Jerry R. Clemons filed his application for disability insurance benefits on June 9, 2006, alleging that he became disabled on July 1, 2006, at age 50, by arthritis, back pain, nerve damage in his left arm and hand, and hepatitis C. (R. 90, 121.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On November 10, 2009, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 23.) On January 26, 2010, the administrative law judge issued a decision finding that Clemons was not disabled within the meaning of the Act. (R. 59.)  On September 1, 2010, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-5.)

**Age, Education, and Work Experience.**  Jerry R. Clemons was born January 11, 1956. (R. 100.) He completed his GED. (R. 124.)  He has worked as a general laborer for a temporary agency. (R. 122.) He last worked October 15, 2000.  (R. 121.)

**Plaintiff's Testimony.** Plaintiff testified that he had been homeless, living on the streets for almost ten years. He had worked at a temporary agency. He received food

from soup kitchens. He was incarcerated two times for robbery and breaking and entering. He said he was a lousy thief and that he got caught at everything he attempted. He indicated that he had done some very stupid things in his lifetime. In the past he abused cocaine, but he stopped using cocaine for his health. He received medical insurance and food stamps from the state. At the time of the hearing, he was living was his mother. He reported that he could not get a job because no one would hire him when then learned of his medical conditions.

He had had hepatitis C for at least ten years. It drained all of his energy, caused him pain, and aggravated his other conditions. He underwent treatment for hepatitis C but it did not work. He took two naps a day because he had no energy. He woke up hourly at night. He had had weeks where he had only slept six to eight hours the whole week.

He reported that he was not able to do very much of anything because of his degenerative disc disease. Although his doctor had instructed him not to engage in certain activities, he would  attempt something anyway and end up hurting himself. Vicodin provided some pain relief and gave him a false sense of security. Although it did not cause him pain to lift something, afterwards he had pain. Sitting also caused him back pain. He could only sit for ten or fifteen minutes before needing to move. Walking and standing also gave him difficulty. He could only walk two to four blocks before he began to experience pain. He had problems with his feet that made walking and standing painful. His neck also caused him continuous pain. He had arthritis and

3

tendonitis in his hands, which made his hands stiff and hard to bend. His left hand was much worse than his right. When he held things, his hands would go numb and cause him to drop things.

He testified that some days were better than others. Occasionally he was able to vacuum the floor without too much difficulty. He made an effort to help around the house even if it caused him pain later. (R. 27-40.)

**Medical Evidence of Record.**  Although the administrative law judge's decision fairly sets out the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

**Physical Impairments.**

Mount Carmel West. On January 15, 2006, plaintiff was treated at the hospital for cellulitis on his left elbow. An x-ray revealed extensive, chronic appearing bone and joint changes at the left elbow. (R. 295-97.)  On March 19, 2006, plaintiff presented at the emergency room because he had accidently cut his right dorsal hand. He had significant pain and redness. (R. 290-91.)

Grant Medical Center. On March 14, 2007, plaintiff presented at the emergency room with complaints of pain in his back and neck. He came to the emergency room after becoming severely dizzy with symptoms of vertigo when he looked up while in an elevator. Clemons was counseled regarding the possibility of vertebral artery disease. (R. 264-65.)

<u>Myung Cho, M.D.</u> On July 3, 2007, Dr. Cho , a state agency physician, reviewed the medical evidence and made a physical residual functional capacity assessment.  Dr. Cho stated the opinion that Clemons could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. He could stand and/or walk about 6 hours in an 8-hour day. He could sit for about 6 hours in an 8-hour day. He was unlimited in his ability to push and/or pull. Dr. Cho said that plaintiff's allegations were partially consistent with the medical evidence. (R. 326-33.)

<u>Jennifer J. Hartman, M.D.</u> On March 4, 2007, plaintiff began seeing Dr. Hartman, a general practitioner. He reported that he was having more difficulties with his hands and feet. Dr. Hartman indicated that plaintiff had arthraligias in his knuckles and numbness and tingling in his feet. His toes crossed outward on his feet. Plaintiff's pain made it difficult for him to sleep. (R. 346.)

On March 26, 2007, Clemons reported that he was having pain in his neck, back and left hip. He rated his pain as a seven on a ten-point scale. Clemons tested positive for hepatitis C. (R. 275-76.)  On April 9, 2007, Clemons reported that he had been experiencing numbness, tingling and pain. (R. 266.)

An April 11, 2007 x-ray of plaintiff's lumbar spine revealed mild thoracic scoliosis convex to the left with the superior aspect of the thoracic spine. An x-ray of the cervical spine showed neural foraminal narrowing bilaterally possibly due to mild uncovertebral joint spurring. An x-ray of his right hand showed no acute bony or joint abnormality. An x-ray of his left hand was normal. An x-ray of the lumbar spine

revealed degenerative changes at L5-S1 with disc space narrowing, spurring, and facet joint hypertrophy. (R. 351.)

On May 11, 2007, Dr. Hartman noted that plaintiff was depressed because his brother had died under suspicious circumstances. Clemons reported decreased energy and concentration. (R. 343.) On July 18, 2007, Dr. Hartman stated the opinion that plaintiff was unable to do manual labor. (R. 242.)

A July 2, 2007 surgical pathology report was consistent with a clinical history of hepatitis C. (R. 360-61.) An August 23, 2007 nuclear medicine cardiolite examination showed no evidence for myocardial ischemia. The patient achieved 71% of the maximum predicted heart rate. (R. 350.)

On August 20, 2007, Clemons reported that he was experiencing increased body pain and worsening arthritis. (R. 338.)

A February 20, 2008 x-ray of plaintiff's cervical spine showed degenerative disc disease and facet arthropathy in the mid cervical spine. There was mild to moderate disc space narrowing and minor end plate osteophyte formation at C5-6. Minor facet arthropathy was noted on the right at C3-4 and on the left at C4-5. (R. 444.) A February 20, 2008 x-ray of his left foot showed moderate first metatarsophalangeal and sesamoid-metatarsal joint osteoarthritis. There was mild hallux valgus deformity. (R. 445.) An x-ray of his right foot, showed moderate degenerative arthrosis and narrowing of the first metatarsophalangeal joint. (R. 446.) An x-ray of the right knee was unremarkable. (R. 447.) An x-ray of left knee revealed no specific abnormality. (R. 448.)

6

On April 17, 2008, Clemons had just started on Celexia. He complained that his Vicodin was not strong enough. The diagnoses were hepatitis C, arthritis secondary to the hepatitis, and depression. (R. 418.)

On August 28, 2008, Dr. Hartman noted that Clemons had started his treatment regimen for hepatitis C and was extremely irritable and volatile. She referred him to a psychologist because his psychological symptoms "were a little more complicated" than those of patients with "simple anxiety/depression." (R. 408.)

On January 13, 2009, Dr. Hartman examined Clemons. Clemons reported pain in his joint that he rated as an eight on a ten-point scale. His hand joints were stiff and sore, and he had some mild joint swelling in his left thumb, pinky finger and middle finger. Dr. Hartman diagnosed hepatitis C, degenerative disc disease of the lumbar spine, arthropathy not otherwise specified, and an episodic mood disorder.(R. 456-58.)

On February 27, 2009, Clemons reported that he continued to have pain in his hands, but it had also progressed into his wrists. He reported that his back was getting worse. He used to have difficulty when he first woke up. He reported that his legs did not move when he got up. This occurred two times a week and lasted for less than a minute. (R. 479-81.)

On April 28, 2009, Dr. Hartman completed a physical capacity evaluation. Dr. Hartman said that plaintiff's maximum ability to lift and carry occasionally was 1-2 pounds. The maximum plaintiff could lift and carry frequently was 1-2 pounds.  He could stand for less than 30 minutes per day, and he could only stand for 15 minutes

7

before needing to sit. He could sit for less than thirty minutes a day, and he could only sit for 15 minutes before needing to stand. Clemons must walk every 30 minutes for five minutes at a time. He had to lie down two to three times in an 8-hour working day.

He could twist, stoop, bend and climb stairs only very occasionally. He could occasionally crouch. He could never climb ladders. He had difficulty balancing on narrow, slippery, or erratically moving surfaces. He could occasionally reach, feel, push or pull. He could rarely perform handling or fingering. He should avoid all exposure to hazards, moderate exposure to vibration, and concentrated exposure to extreme cold, extreme heat, wetness, humidity, and fumes, odors, or dust. He could sometimes understand, remember and carry out simple instructions. He could make simple work-related decisions. (R. 466-69.)

A March 3, 2009 MRI of plaintiff's lumbar spine revealed multilevel degenerative changes of the lumbar spine with disc bulges and osteophytes resulting in narrowing of the neural foramina. There were annular fissures present at L2-3 and l4-5. The disc narrowing was most severe at L5-S1. (R. 471-72.) On March 19, 2009, Dr. Hartman reviewed plaintiff's MRI results with him.(R. 485.)

On July 16, 2009, plaintiff reported that his back had been hurting more. (R. 496.)

<u>Ohio Gastroenterology Group, Inc.</u> In a June 28, 2007 letter, Raghuram Reddy, M.D. and Joseph Checca, Jr. summarized their evaluation of Clemons' hepatitis C. Clemons complained of some occasional but slight nausea. He did not have abdominal pain or a significant rash. He occasionally had some pruritis. He had jaundice six

8

months to a year ago, although he acknowledged that at that time he was drinking two 40-ounce bottles of beer per day. He reported abusing cocaine in the 1980s. He had multiple tattoos and pierced ears. He also reported symptoms of a rheumatoid-like syndrome involving joint discomfort and ulnar deviation in his hands. Clemons was diagnosed with chronic active hepatitis C, genotype 1A probably of long-standing duration. (R. 369-70.)

On May 29, 2008, Dr. Reddy evaluated plaintiff and initiated treatment for his chronic active hepatitis C. (R. 387.) Four weeks into his treatment, Clemons experienced shortness of breath, fatigue, weakness, and lightheadedness when he stood up. Other than these complaints, he was tolerating the medication fairly well. He reported some changes in his vision. He also reported increased depression and anxiety. (R. 385-86.) On August 18, 2008, plaintiff complained of fatigue, light-headedness, and occasional shortness of breath on exertion. He reported increased irritability. His labs showed that he was anemic, although his liver enzymes were relatively normal. (R. 384.)

Amy M. Kopp. M.D. On October 16, 2007, plaintiff was evaluated for possible glaucoma. (R. 373-81.) On November 19, 2007, Dr. Kopp diagnosed Clemons with normal tension glaucoma in the right eye. Clemons was prescribed Isatol. She noted that interferon therapy for treatment of hepatitis C could result in ischemic retinopathy, hemorrhages, cotton wool spots, and ischemic optic neuropathy that could significantly worsen his glaucomatous damage. Dr. Kopp recommended that plaintiff be closely followed and undergo vision and pressure checks. (R. 382-83.)

In a July 20, 2007 letter, Drs. Reddy and Checca discussed the necessary steps plaintiff must take prior to beginning treatment for hepatitis C. The treatment could cause major depression or cardiac problems. As a result, a psychiatric evaluation and cardiac stress test was recommended prior to treatment. Plaintiff had a 45% chance of responding to treatment. (R. 366-67.)

Kevin Lutz, D.P.M. On February 20, 2008, Dr. Lutz examined plaintiff at the request of his primary care physician. Clemons had reported bilateral foot pain for some time. He indicated that he had degenerative joint disease in both feet. He had bilateral pes planus in both feet in a weight bearing and non-weight bearing position. Range of motions in all joints was slightly diminished. Musculoskeletal strength in the lower extremities was severely impaired. Bilateral hallux abductor valgus deformity was noted with the left being worse than the right. Dr. Lutz opined that Clemons' degenerative joint disease was likely to continue, although attempts could be made to slow its progression. He recommended that plaintiff purchase an over-the-counter insert.  (R. 430-31.) On March 19, 2008, Dr. Lutz examined plaintiff to follow-up on his complaints of bilateral foot pain. Dr. Lutz diagnosed tarsal tunnel and deep peroneal neuritis of the right foot. (R. 425-26.)

Scott R. Littrell, D.P.M. On April 23, 2008, Dr. Littrell examined plaintiff for follow-up care of his tarsal tunnel and deep perineal neuritis. Clemons complained of stiffness in his mid-foot and an inability to raise and lower his right lower extremity. At his last appointment, Clemons was given a metatarsal pad to alleviate pain, and it was

recommended that he obtain over-the-counter orthotics for arch support. Clemons reported continued stiffness and aching pain. Dr. Littrell opined that a weakness of bilateral lower extremities with burning and shooting pain from the back going down the course of his entire lower extremities bilaterally was more likely the result of radiculopathy. He recommended that plaintiff be seen by a back specialist. (R. 414-15.)

**Psychological Impairments.**

Scott Lewis Donaldson, Ph.D. On June 18, 2007, Dr. Donaldson, a psychologist, evaluated plaintiff. Clemons reported that he had been addicted to Valium. He said that he did not use alcohol or illicit substances. On mental status examination, Clemons exhibited flat affect with an agitated mood. His eye contact was adequate. He reported difficulty falling asleep. He woke up frequently throughout the night and required naps during the day. He reported suicidal ideation without intent stating the he did not care if he died. He suffered from feelings of hopelessness and helplessness. He experienced mood swings throughout the day and symptoms of depression which included diminished interest in activities, insomnia, psychomotor agitation, fatigue, difficulty concentrating, and thoughts of death. Clemons reported suffering from anxiety and worrying about everything. He reported being restless, edgy, irritable, and easily fatigued. When he was incarcerated, he experienced panic-like symptoms. Clemons was oriented in three spheres. His memory for past and recent events appeared intact. His overall intelligence fell within the average range.

11

Dr. Donaldson diagnosed dysthymic disorder and a generalized anxiety disorder. He assigned a current Global Assessment of Functioning ("GAF") score of 55-65. Dr. Donaldson opined that Clemons' ability to understand, remember and carry out one- or two- step job instructions did not appear to be impaired. His ability to perform repetitive tasks was moderately limited by chronic pain and his physical status. His level of motivation was lacking as a result of his depression and anxiety. His interpersonal relationship skills, as well as his ability to relate to supervisors and co-workers, was moderately limited. His ability to withstand the stress and pressures associated with day-to-day work appeared to be moderately limited. (R. 301-04.)

Cindy Matyi, Ph.D. On June 26, 2007, Dr. Matyi, a psychologist for the state agency, reviewed the psychological evidence and completed a mental and psychiatric review technique assessment. Dr. Matyi noted that plaintiff was diagnosed with dysthymia and a generalized anxiety disorder. Dr. Matyi concluded that plaintiff was not significantly limited in his abilities to remember locations and work-like procedures or to understand and remember short and simple instructions. He was moderately limited in his ability to understand and remember detailed instructions. With respect to sustained concentration and persistence, he was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to work in coordination with or proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

12

without an unreasonable number and length of rest periods. With respect to social interaction, plaintiff was moderately limited in his ability to interact with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Plaintiff was moderately limited in his ability to respond to changes in the work setting.

Plaintiff had moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning. He had only mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 308-25.)

Karla Voyten, Ph.D. On October 31, 2007, Dr. Voyten, another state agency psychologist, reviewed all the psychological evidence and affirmed Dr. Matyi's assessment as written. (R. 357.)

Christopher A. Kovell, D.O. On March 27, 2008, Dr. Kovell performed a psychiatric evaluation at the request of his family physician and liver specialist because he was under consideration for interferon therapy. Clemons reported an extensive history with the criminal justice system. He acknowledged committing many crimes in his life beginning at the age of 13. He was imprisoned three times. He was currently on parole.

Clemons reported having been depressed for the past couple of years. He had low energy and motivation. He reported irritability and symptoms of anxiety when in

13

small spaces. Clemons was pleasant and cooperative throughout the assessment. He

had a depressed mood, but he denied any active suicidal thoughts. His insight and

judgment were intact. Dr. Kovell diagnosed dysthymic disorder and polysubstance

abuse in remission. Dr. Kovell believed that Clemons was an appropriate candidate for

interferon therapy. He prescribed him an antidepressant. (R. 420-22.)

### Administrative Law Judge's Findings.

1. The claimant has not engaged in substantial gainful activity since
the alleged onset date of July 1, 2006 (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: degenerative
disc disease of the cervical and lumbosacral spine with chronic
back pain; hepatitis C with joint arthralgias; dysthymic disorder;
generalized anxiety disorder; and a history of drug use (20 CFR
416.920(c)).

3. The claimant does not have an impairment or combination of
impairments that meets or medically equals one of the listed
impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned
finds that the claimant has the residual functional capacity to
perform light work as defined in 20 CFR 416.967(b) involving
limited interaction with others and requiring only simple and
repetitive tasks.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on January 11, 1956 and was 51 years old,
which is defined as an individual closely approaching advanced
age, on the date the application was filed (20 CFR 416.963).

14

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of jobs skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 2, 2007, the date the application was filed (20 CFR 416.920(g)).

(R. 50-59.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- <u>The administrative law judge committed reversible error in refusing to give controlling weight or at least great weight to the opinions of plaintiff's treating doctors</u>. Plaintiff maintains that the administrative law judge erred by not giving controlling weight to the opinion of Dr. Hartman in her April 28, 2009 physical capacity evaluation of his abilities. Plaintiff argues that the administrative law judge failed to provide reasonable support for his rejection of her opinion. Plaintiff contends that Dr. Hartman's opinion was entitled to great weight because she was his treating doctor. He also points to the length and frequency of the treatment relationship; Dr. Hartman treated plaintiff ten times from March 4, 2007 through September 22, 2009, which provided her with a detailed and longitudinal picture of Clemons' impairments. Dr. Hartman performed multiple examinations of plaintiff, prescribed him medications, and  referred him to testing and other specialists. Clemons maintains that Dr. Hartman's opinion is supported by other findings in the record including medical signs and laboratory findings. There is substantial objective evidence in the record supporting Dr. Hartman's opinion, and

her opinion is consistent with the record as a whole. Plaintiff also argues that the administrative law judge failed to have either a medical or vocational expert at the hearing, and he relied solely on the record. The residual functional capacity assessment formulated by the administrative law judge is inconsistent with the record. Nothing in the record supports a finding that plaintiff can perform light work.

- The administrative law judge improperly assessed plaintiff's credibility. Plaintiff argues that the administrative law judge placed too much emphasis on the fact that plaintiff had been incarcerated two times without considering the length of time that had passed since he was last incarcerated. The administrative law judge also found that plaintiff's claim that he no longer used cocaine incredible because there was no evidence of "the kind of sustained and determined effort that would be necessary to overcome such a long term problem." (R. 28.) The administrative law judge failed to note, however, that the record did not contain any evidence suggesting that he still used cocaine.

- The administrative law judge failed to consider Medical Vocational Guideline 201.12. According to Medical Vocational Guideline 201.12, a person is disabled if he is between the ages of 50 to 54, can only perform sedentary work, has a high school education that does not provide for direct entry into skilled work, and has no unskilled or previous work. At

17

best, Clemons is capable of sedentary work, and he should have been

found disabled under the Medical Vocational Guidelines.

**Analysis.**  Treating Doctors' Opinions.  Plaintiff argues that the Administrative

Law Judge erred in rejecting the opinion of Dr. Hartman. A treating doctor's opinion[1]

on the issue of disability is entitled to greater weight than that of a physician who has

examined plaintiff on only one occasion or who has merely conducted a paper review of

the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d

53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048,

1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security

generally gives more weight to a treating doctors' opinions because treators are usually

"most able to provide a detailed, longitudinal picture" of the claimant's medical

impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

not inconsistent with the other substantial evidence in your case record" the
Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater
insight into his patient's condition than a one-time examining physician or a medical
adviser, Congress specifically amended the Social Security Act in 1967 to provide that to
be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A).
Consequently, a treating doctor's opinion does not bind the Commissioner when it is
not supported by detailed clinical and diagnostic test evidence.   *Warner v. Commission-*
*er of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)*; Varley v. Secretary of Health and*
*Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973
(6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v.*
*Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975).  20 C.F.R. §§404.1513(b), (c), (d),
404.1526(b), and 404.1527(a)(1)[2].

The Commissioner's regulations provide that she will generally "give more
weight to the opinion of a source who has examined you than to the opinion of a source
who has not examined you." 20 C.F.R. § 404.1527(d)(1).  When a treating source's

----

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial
gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than 12
months. See §404.1505. Your impairment must result from anatomical,
physiological, or psychological abnormalities which are demonstrable by
medically acceptable clinical and laboratory diagnostic techniques. See
§404.1508.

opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  *Id.*  Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*  When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ."  The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion.  When the doctor has treated the claimant long enough "to

20

have obtained a longitudinal picture of your impairment, we will give the source's

[opinion] more weight than we would give it if it were from a non-treating source."  20

C.F.R. §404.1527(d)(2)(i).

The Commissioner has issued a policy statement about how to assess treating

sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.  Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.  A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion

21

> is rejected.  It may still be entitled to deference and be
> adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and labora-tory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weigh-ed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them."  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).  Even when the Commissioner determines not to give a

treartor's opinion controlling weight, the decision-maker must evaluate the treator's

opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544;

*Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

presumption that the treating physician's opinion "is entitled to great deference." *Rogers*

*v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley,* above. The

Commissioner makes the final decision on the ultimate issue of disability. *Warner v.*

*Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human*

*Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human*

*Services,* 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler,* 756 F.2d at 435; *Watkins v.*

*Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

<u>Treating Doctor: Discussion</u>. The administrative law judge stated:

> Careful consideration has also been given to the opinion of Dr. Hartman
> expressed on April 28, 2009 (Exhibit 22F, pages 4-7). Among other
> limitations, Dr. Hartman opined that the claimant could lift/carry no
> more than two pounds at a time and could stand/walk less than 30
> minutes and sit less than 30 minutes total during an eight-hour workday.
> Obviously, such limitations would prevent the performance of any
> competitive employment on a full-time basis. These and most of the other
> limitations described by Dr. Hartman appear excessive and unsupported.
> Specifically, the treatment records of Dr. Hartman, including diagnostic
> test results and clinical findings, fail to support such incapacitating
> functional limitations. Furthermore, such incapacitating functional
> limitations are not supported by the remainder of the medical record. It
> would appear that Dr. Hartman may have accepted the claimant's
> subjective complaints and alleged functional limitations in reaching her
> conclusion rather than weighing these against the objective medical
> evidence. Accordingly, the opinion of Dr. Hartman must be rejected as
> inaccurate and unpersuasive.

(R. 56.) The administrative law judge further stated that despite plaintiff's complaints of musculoskeletal problems, his treatment had been conservative and nonaggressive. No surgical intervention has been performed or recommended. Although he took several medications, the primary source of his side effects were related to the interferon treatment that was discontinued because it was ineffective. (R. 58.)

The administrative law judge properly considered Dr. Hartman's opinion, and there is substantial evidence in the record supporting her decision to reject it. The administrative law judge concluded that Dr. Hartman's opinion was based on plaintiff's subjective complaints and not supported by diagnostic test results and clinical findings:

> With respect to degenerative disc disease of the cervical and lumbosacral spine, a hospital emergency room report of March 14, 2007 revealed a history of back pain for years with some pain to the neck and some radiation to the left leg. Examination demonstrated no neurological deficit at that time and the claimant was diagnosed and treated conservatively for chronic neck and back pain. (Exhibit 1F). The claimant was referred by Jennifer Hartman, M.D., a treating physician, for x-rays of the cervical spine because of continued complaints of neck pain. X-rays were taken February 20, 2008 and demonstrated evidence of degenerative disc disease with mild to moderate disk space narrowing and minor facet arthropathy (Exhibit 19F, page 2). Evaluation of the claimant by a treating podiatrist on April 23, 2008 revealed complaints of pain from the back into the legs indicative of radiculopathy (Exhibit 18F, page 12 and 13). Because of right leg weakness, the claimant was referred by Dr. Hartman for an MRI of the lumbar spine conducted on March 3, 2009. This demonstrated multilevel degenerative changes of the lumbar spine with disc bulges and osteophytes resulting in narrowing the neural foramina and disk space narrowing most severe at L5-S1 (Exhibit 22F, pages 9 and 10). The claimant was sent by Dr. Hartman for x-rays of the cervical spine in July 27, 2009 because of continued pain with findings of mild spondylosis at C5-6 (Exhibit 23F, pages 31 and 32). Dr. Hartman also referred the claimant on the same day for x-rays of the lumbar spine because of continued pain. These revealed findings consistent with degenerative

24

> changes at L5-S1 not significantly changed since April 2007 (Exhibit 23F, page 30). Outpatient treatment records from Dr. Hartman dating through August 13, 2009 in conjunction with musculoskeletal examination consistently described the musculoskeletal examination as normal but stiff (Exhibit 23F).

(R. 55.) The record contains no x-ray, MRI, EMG, or clinical evidence of nerve root impairment. Clinically, there may be some limitation of motion, but there is no consistent, clinically significant evidence of neurological deficits or muscle weakness. No examining physician has identified specific, clinically significant neurological deficits that, in the physician's opinion, would be consistent with nerve root impingement or a bony abnormality that could cause severe, disabling pain. While the x-rays and MRIs are consistent with impairments to Clemons' neck and back that would cause pain, they do not contain findings that would require an administrative law judge to find that the pain is disabling.

Subjective Symptoms: Credibility Determination. Pain is an elusive phenomena. Ultimately, no one can say with certainty whether another person's subjectively disabling pain precludes all substantial gainful employment. The Social Security Act requires that the claimant establish that he is disabled. Under the Act, a "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A):

25

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) the Sixth Circuit established the following test for evaluating complaints of disabling pain.  First, the Court must determine "whether there is objective medical evidence of an underlying medical condition."  If so, the Court must then

> examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987).

26

The Commissioner has adopted a Social Security Ruling to guide decisionmakers in their consideration of subjective complaints of pain.  SSR 88-13, CCH Unemployment Insurance Reporter ¶14,118A (July 20, 1988).  It provides that objective evidence about the alleged pain-inducing impairment(s) should be developed for the record:

> Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity.  Whenever available, this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.

*Id.*, at p. 2134.  Should the factfinder conclude that the objective evidence alone does not support the claimant's subjective complaints of disabling pain, he must gather the following information:

> [D]etailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge.
>
> In developing evidence of pain or other symptoms, it is essential to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:
>
> > 1.   The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.      Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.      Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4.      Treatment, other than medication, for relief of pain;

5.      Functional restrictions; and

6.      The claimant's daily activities.

*Id.*, at p. 2135.  Finally, the decisionmaker must determine whether the claimant's pain and other limitations permit him to work:

> The RFC assessment must describe the relationship between the medically determinable impairment and the conclusions of RFC which have been derived from the evidence, and must include a discussion of why reported daily activity restrictions are or are not reasonably consistent with the medical evidence.
>
> In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject that individual's subjective complaints solely on the basis of such personal observations.  Rather, in all cases in which pain is alleged, the determination or decision rationale is to contain a thorough discussion and analysis of the objective medical evidence and the non-medical evidence, including the individual's subjective complaints and the adjudicator's personal observations.  The rationale is then to provide a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's capacity to work.

*Id.*  SSR 88-13 replaced SSR 82-58, CCH Unemployment Insurance Reporter ¶14,358 at pp. 2499-48 through 2499-53 (October 1982), but SSR 88-13 does not represent a change

28

in policy.  It merely restates the Commissioner's long-standing policy on evaluating pain set out in 20 C.F.R. §404.1529 (August 20, 1980) and codified in 42 U.S.C. §420(d)(5)(A).

When 42 U.S.C. §423(d)(5)(A) was passed in 1984, Congress directed the Commissioner to appoint a commission to study pain and develop new criteria for evaluating pain.  Then Congress intended to adopt a permanent statutory standard. The interim standard established by §423(d)(5)(A) was to apply only to "determinations made prior to January 1, 1987."  98 Stat. at 1799.  The decision at issue here was made subsequent to January 1, 1987.  Although the Commissioner completed the pain study, Congress has not enacted a permanent statutory standard.

Nonetheless, the Congressional purpose in enacting §423(d)(5)(A) was to codify 20 C.F.R. §404.1529 and SSR 82-58.  Senate Finance Committee Report 98-466, 98th Cong., 2d Sess., May 18, 1984 5.476; *Duncan v. Secretary of Health and Human Services*, 801 F.2d at 852.  And the Sixth Circuit in *Duncan*, 801 F.2d at 852-853 relied on both the Commissioner's pre-existing policy and the codification of that policy in announcing the two-pronged test.  The regulation itself, which was amended July 18, 1997, provides, in relevant part:

> (a) *General.*  In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c).  By other evidence, we mean the kinds of evidence

described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e).  These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.  We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.  However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.  In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.)  We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a).  In *McCormick v. Secretary of Health and Human Services*, 861 F.2d

998, 1003 (6th Cir. 1988), the Sixth Circuit held "that because the standards announced

by the Court in *Duncan* were authorized by §404.1529 as well as by the Reform Act, they continue to apply to cases decided after the sunset of the Reform Act."

The administrative law judge properly assessed plaintiff's allegations of disabling pain:

> In spite of his complaints involving significant musculoskeletal difficulty, the claimant's treatment has been conservative in nature and nonaggressive. No surgical intervention has been performed and there is no indication in the record of the need for surgical intervention. Although the claimant has required treatment with multiple medications, he primarily had difficulty due to some side effects from interferon treatment that was discontinued apparently as ineffective.

> The claimant during the hearing had no difficulty sitting or moving around. His testimony was cogent and focused. His claim of having stopped using cocaine is not credible. There is no evidence of the kind of sustained and determined effort that would be necessary to overcome such a long term problem. Incredibility in this regard affects the overall credibility of claimant.

> The claimant's failure to engage in substantial gainful activity can be attributed to reasons other than medical impairments. That is, the claimant has a very limited history of work activity for most years prior to his alleged onset date of disability. He shows little evidence of being motivated to work. The claimant has lived with his mother for the past several years.

> The evidence demonstrates that the claimant has been incarcerated on two occasions, for grand theft and for attempted robbery. Such history of criminal involvement adversely affects his credibility for truthfulness and honesty.

> In summary, considering the criteria enumerated in the Regulations, Rulings and case law evaluating the claimant's subjective complaints, the claimant's testimony was not persuasive to establish an inability to perform the range of work assessed herein. The location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors, are adequately addressed and

> accommodated in the above residual functional capacity. The lack of
> support for the claimant's subjective complaints and functional limitations
> is not due to any unexplained mental impairment but to the claimant's
> exaggeration of complaints.

(R. 58.) The administrative law judge properly considered all of plaintiff's complaint

and the medical evidence related to his conditions. He concluded that the clinical

findings did not support plaintiff's allegations. The administrative law judge properly

relied on his conservative treatment, his behavior and demeanor at the hearing, and his

limited work history. It was not error for the administrative law judge to take into

consideration plaintiff's criminal history when assessing his credibility. Consequently,

the record contains substantial evidence supporting the administrative law judge's

assessment of plaintiff's credibility.

    Medical Vocational Guideline 201.12. Plaintiff argues that because he is limited to

sedentary work he is disabled according to Medical Vocational Guideline 201.12. The

determination of a claimant's residual functional capacity is a legal decision reserved

for the administrative law judge. 20 C.F.R. § 416.927(e)(2) ("Although we consider

opinions from medical sources on issues such as . . . your residual functional capacity. . .

, the final responsibility for deciding these issues is reserved to the Commissioner."); 20

C.F.R. § 416.946(c)("If your case is at the administrative law judge hearing level under §

416.1429 . . . the administrative law judge . . . is responsible for assessing your residual

functional capacity."). Here, the administrative law judge determined that plaintiff was

capable of performing light work, and that determination is supported by substantial

evidence in the record. The administrative law judge properly used the grid as a

framework to conclude that plaintiff was not disabled. 20 C.F.R. Part 404, Subpart P, Appendix 2, §202.13.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

s/Mark R.  Abel\
United States Magistrate Judge